# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 9, 2014 Session

## STATE OF TENNESSEE v. MARKREO QUINTEZ SPRINGER and WILLIAM MOZELL COLEY

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3254      Mark J. Fishburn, Judge**

_____

### No. M2012-02046-CCA-R3-CD - **Filed June 20, 2014**

_____

A jury convicted the defendants, Markreo Quintez Springer and William Mozell Coley, of first degree (felony) murder; second degree murder, a Class A felony; and especially aggravated robbery, a Class A felony. On appeal, the defendants launch challenges against: (1) the sufficiency of the evidence; (2) the admission of a witness's recorded prior inconsistent statement; (3) the chain of custody for DNA evidence; (4) the admission into evidence of a recording of the defendants discussing the events in the back of a police vehicle; (5) the exclusion of a recorded statement from a deceased witness; (6) the admission of testimony regarding threats against a witness made by one of the defendants; and (7) the trial court's refusal to grant a severance. After a thorough review of the record and issues raised, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and JOE H. WALKER, III, SP. J., joined.

Rob McKinney, Nashville, Tennessee, for the appellant, Markreo Quintez Springer.

Ana Escobar (at trial) and Peter D. Heil (on appeal), Nashville, Tennessee, for the appellant, William Mozell Coley.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Victor S. Johnson, District Attorney General; and Rob McGuire and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victim, Sadagh Maleki, was shot and killed at his place of business, Lucky's Auto Imports, in Nashville, on July 27, 2009. After witnesses implicated the defendants in the shooting, the defendants were arrested in Cookeville. They both asserted their right against self-incrimination. Law enforcement covertly placed a recording device in the patrol car in which they were transported to Nashville, and the defendants were recorded talking to each other when they thought they were alone.

The defendants moved to suppress the recording prior to trial. At the suppression hearing, Detective Matthew Filter testified that both defendants asserted their right to remain silent, after which they were not questioned. Instead, Detective Filter hid a recording device in the marked patrol car which would be transporting them. He then left them alone in the car for ten to fifteen minutes in a locked sally port, with officers standing outside the car but out of earshot. His intention was to capture some discussion of the crime. The record does not contain the trial court's oral or written ruling on the motion to suppress, but the evidence was admitted at trial.

At trial, the victim's son, Ramin Maleki, testified that his sixty-nine-year-old father had owned Lucky's Auto Imports for twenty-three years and that he habitually closed the business at around 5:00 or 6:00 p.m. during the summertime. On the day of the victim's death, the victim had been driving a Chevy truck; after the homicide, the victim's pipe and the lunch the victim's wife had packed were recovered from the truck. The victim's son testified that the victim had a .25 caliber gun which "carried, like, two shots," and which the victim routinely took to work. The weapon was never recovered after the homicide.

Three witnesses who were acquainted with the defendants testified regarding events before and after the crimes which implicated the defendants in the robbery and homicide. Tabitha Reese[1] and Maurice Smith were living together in a room at a boarding house on Dickerson Pike at the time of the shooting. Ms. Reese was incarcerated on unrelated charges at the time of trial, and she had prior convictions for burglary and forgery. Mr. Smith was on probation for a robbery conviction, charged with filing a false report, and had prior convictions for receiving and concealing stolen property. Both Mr. Smith's and Ms. Reese's charges had arisen separately and after the shooting, and, while both acknowledged hoping for some sort of leniency, neither had any bargain in place with the prosecution. Mr. Smith,

---

[1]Ms. Reese's name is misspelled "Reece" in various places in the record.

however, testified that no violation of his robbery probation had been filed, although he was charged with filing a false report while on probation. Mr. Smith further testified that he was on probation on July 29, 2009, when he gave a statement to police. He stated that the police told him that if he didn't give a statement, it would affect his probation. Ms. Reese acknowledged she was being represented by an attorney who had formerly represented Mr. Springer in this case. The attorney was called to testify that she had not been aware of the conflict at the time and that she had not discussed the case against the defendants with Ms. Reese.

Mr. Springer, known as "Kreo," and Mr. Coley, known as "Bud," rented a room at the boarding house with Mr. Smith and Ms. Reese. Ms. Reese testified that prior to the shooting, the property manager had put a note on the defendants' door informing them that they were behind in their rent. On the afternoon of July 27, 2009, Ms. Reese had just returned from an out-of-town trip. She saw the defendants return to the boarding house between 4:00 and 5:00 p.m. They came to her room and spoke with Mr. Smith. While they were there, Mr. Springer said to her, "If I don't see you again, then it was nice to know you." He did not respond when she asked what he meant. Ms. Reese testified that the defendants left with their friend Ifeanyi "Iffy" Nwaigwe.

Mr. Smith confirmed that the defendants were in need of money. According to Mr. Smith, he saw the defendants in the early afternoon, and they said they were broke and needed money for rent. He heard them talking about committing a robbery. Mr. Springer mentioned that he had talked to a man about buying a car, and the defendants later made a plan to rob the man. Mr. Smith overheard Mr. Springer call Mr. Nwaigwe to bring him a gun, and Mr. Nwaigwe came to the house and gave Mr. Springer a black rag with a pistol inside it. Mr. Smith acknowledged having previously said the defendants went to Mr. Nwaigwe's car when retrieving the gun. He testified that at the time, he did not really think the defendants would commit a robbery, both because of their general character and because they had no plan for disposing of the radios they discussed taking in the robbery. The defendants left about twenty minutes after getting the gun.

According to Ms. Reese, when the defendants returned to the boarding house after an absence of twenty to twenty-five minutes, Mr. Springer was sweating and distraught. Mr. Coley had blood on his shirt and what appeared to be a bullet wound on his forearm. Ms. Reese overheard Mr. Springer say, "I don't know if I killed him or not." Mr. Smith accompanied the defendants to their room, and Ms. Reese later gave Mr. Coley some band-aids. She and Mr. Smith left the house, and the defendants were gone when they returned.

Mr. Smith also testified that the defendants were gone from the boarding house about twenty to twenty-five minutes. When they returned, Mr. Coley had been shot in the arm and

was bleeding on his shirt; Mr. Smith advised him to run cold water on the wound. Mr. Springer was hysterical and told Mr. Smith that after Mr. Coley was shot, Mr. Springer shot the man and "watched him take his last breath." Mr. Smith saw the defendants take off their clothes and put them into either one or two bags. He acknowledged having told police that Mr. Springer had on a long-sleeved black shirt, black pants and purplish-white shoes and that Mr. Coley was wearing black shorts, a gray tank top, a black shirt, and black shoes. On cross-examination, Mr. Smith testified that the defendants came back with a .25 caliber chrome weapon which was not a two-shot derringer. Mr. Smith also testified that Mr. Springer told him the circumstances under which Mr. Coley had been wounded: "Bud was supposed to jump him and the guy got the best of him and shot Bud." On redirect examination, Mr. Smith testified that he had not seen the chrome gun prior to the defendants' return and that they still had the black .22 revolver when they returned. He also stated that Mr. Springer said the .25 caliber weapon belonged to the victim. He testified the defendants then left with Mr. Nwaigwe.

Mr. Smith denied that the police had ever contacted him regarding possessing or selling a gun related to the case. However, Detective Filter testified that on August 29, 2009, he called Mr. Smith and asked him if he had sold a gun, and Mr. Smith denied doing so.

Mr. Nwaigwe testified that he had known the defendants since they were twelve years old and that he did not want to be testifying against them. He acknowledged that he was not charged with any crimes regarding the homicide but stated he was not receiving any leniency on a drug-related probation which had begun approximately two weeks before the homicide. However, no violation of probation was filed in the case, and he was not being charged with possessing a weapon although he had admitted to police he had a weapon at the time.

Mr. Nwaigwe testified that he had played basketball with the defendants for one to three hours on the day of the robbery; during which time, the defendants discussed "making some money" and "hitting licks," which he interpreted as "probably getting the dope boy or something." The defendants also discussed going to Lucky's to get tags, but Mr. Nwaigwe did not think that the potential robbery was connected with the car lot. Mr. Nwaigwe had recently begun his probation and could not legally possess a weapon; accordingly, he asked if anyone wanted his .22 revolver. No one said anything, but he gave it to one of the defendants. Mr. Nwaigwe testified he did not remember which. He testified the defendants did not ask for his gun. According to Mr. Nwaigwe, he went to his house after the game, got the gun, and took it to the defendants' boarding house sometime after 4:00 p.m. but before nightfall. An hour or two later, the defendants called him, told him Mr. Coley had been shot, and asked him to come get them. Mr. Coley's arm was wrapped up, and Mr. Springer was "kind of freaking out." Mr. Nwaigwe agreed Mr. Springer said, "I think I shot him." However, he denied overhearing a conversation between the defendants.

-4-

The prosecutor reminded Mr. Nwaigwe that he had reviewed his recorded interview only the previous day and asked if he would like to review it again. Mr. Nwaigwe stated that reviewing the statement would not help him, and he continued to deny having any recollection of overhearing a conversation or of his statement to police. Mr. Nwaigwe acknowledged on cross-examination that he had not volunteered any information to police. He also acknowledged that he had told police that his cousin Charles was there the entire time they were playing basketball. Mr. Nwaigwe testified that he drove a gold truck, and Detective Filter testified that Mr. Nwaigwe's car was taken into custody and that police recovered blood from the vehicle.

The defendants objected when the prosecution indicated later in the trial that it intended to introduce, through Detective Filter, portions of Mr. Nwaigwe's recorded interview as prior inconsistent statements. The trial court held a jury-out hearing and concluded that the statements were admissible. The record reflects that Mr. Nwaigwe was present at the time, having been re-subpoenaed. Detective Filter testified regarding Mr. Nwaigwe's statements to police. According to Detective Filter, Mr. Nwaigwe stated that he had given a .22 revolver to Mr. Springer. He also told police that the defendants asked him to pick them up sometime after he had dropped off the gun. They had packed their clothes, and they put them in his truck and went to his house. Mr. Coley had been shot, and Mr. Springer acted nervous and scared. Mr. Nwaigwe overheard a discussion in which they discussed having a .25 caliber handgun.[2] Portions of Mr. Nwaigwe's recorded interview were played.

Mr. Nwaigwe told police that the defendants had borrowed his gun the previous month and that the day of the shooting, Mr. Springer had asked for his gun during a telephone conversation. Mr. Nwaigwe took his gun to Mr. Springer after the basketball game. He then dropped the defendants at a Mapco so they could go to a nearby McDonald's. Later, they asked him to pick them up, and he observed that Mr. Coley had been shot. Mr. Nwaigwe also told police that they returned to his house and that, by standing at the top of the stairs, he was able to overhear the defendants talking in his basement. Mr. Nwaigwe heard Mr. Springer say that he had shot three times and took off running. Mr. Nwaigwe also overheard Mr. Springer describe how Mr. Coley had asked the victim for tags and how the victim had taken them into the office where the shooting occurred. Mr. Nwaigwe stated in the interview that he did not think the defendants took any property from the victim.

At approximately 9:45 p.m. on the night of the homicide, Detective Brian Brown was dispatched to respond to a 911 call reporting that Mr. Coley had been shot by three teenagers

---

[2]The portion of the interview admitted at trial contained no reference to a .25 caliber weapon. No objection was made to Detective Filter's testimony regarding the .25 caliber weapon.

who were trying to rob him at a location approximately five to ten minutes by car from the scene of the homicide. The person placing the call to 911 reported that two to three men had "jumped" Mr. Coley and that he had been shot in the arm trying to fight them. When Detective Brown arrived, Mr. Coley was being treated for an injury to his left forearm and stated that three black teenagers in black clothing and ski masks had tried to rob him. No other witnesses, including the 911 caller, were located, and no other evidence was found related to the reported attempted robbery. Detective Brown was then dispatched to the scene of the homicide.

Officer Joe Williams photographed the scene of the homicide at 10:30 p.m. on the night of the homicide, and he testified that it was not immediately apparent that the death was a homicide or that the victim had been shot. Officer Williams attempted to get fingerprints from the exterior doors and collected $742 from the victim's front pocket. He found no shell casings and no blood trails. The victim was slumped against a doorway next to a shelf housing numerous car parts and stereo speakers, and a key was found beneath his right hand, which had a laceration.

At approximately 9:30 a.m. the following day, after the death had been ruled a homicide, Officer William Kirby went to the crime scene to collect further evidence. The crime scene was not attended by officers overnight, but it had been locked. There was no sign of forced entry. Officer Kirby testified that the office was in disarray. Officer Kirby collected a bullet from a wall and blood from the door behind the victim. He also found blood on a stereo, and he collected the stereo and a swab from the stereo into evidence. He submitted the items he collected to the evidence room. No blood trails were found, but there had been a heavy rain.

Detective Filter confirmed that there was cash and some gift cards in the victim's pocket. No tools or cars were taken, and no one reported a wounded man running down the road next to the homicide. Detective Filter submitted the stereo to the Tennessee Bureau of Investigation ("TBI") for DNA testing.

The day after the shooting, Ms. Reese was helping the property manager's daughter clean the defendants' room after they had vacated it. She found a bullet casing and put it in a jewelry case. Although Ms. Reese testified she was with the manager's daughter, Mr. Smith testified he helped her clean the room and was there when she found the casing. On July 29, 2009, Ms. Reese found a trash bag containing what she recognized as the defendants' bloody clothing in the bushes next to a dumpster on the property. She tossed the bag back into the bushes and told the property manager, who called the police. She then directed police to the trash bag and gave them the casing. Detective Brown and Detective Filter responded to the property manager's call.

-6-

On cross-examination, Ms. Reese acknowledged that she had told the police she did not like the defendants. She also acknowledged having said that Mr. Springer was wearing black gym shorts, a red and white jersey shirt, and pink crocs.

Detective Brown testified that he was present when an officer named Mace collected the bag. Detective Filter examined the contents of the bag and identified photographs of the items recovered, including a bloody gray tank top, bloody khakis, two pairs of black shorts, a bandana, a long-sleeved black t-shirt, a baseball cap, a pair of black shoes, and a pair of mostly white shoes.

Dr. John Davis testified that the victim had two gunshot wounds, one to the chest and one to the arm. Two bullets, one of which had passed through the victim's lung and aorta, killing him, were recovered from the body. According to Dr. Davis, the wound to the victim's chest had stippling, indicating the gun was one to two feet from the victim when it fired. Both Dr. Davis and Detective Filter testified that the victim's body had been cleansed prior to his nails being clipped, eliminating the possibility of recovering DNA from under his nails.

Agent Terri Arney testified that the bullet recovered from the wall and the two recovered from the victim were all .22 caliber long-rifle bullets, and all were fired from the same unidentified firearm, which could have been a .22 revolver. The casing recovered from the boarding house was a .22 caliber either long or long-rifle casing; it was not possible to link the casing to the bullets without the gun.

Agent Laura Staples testified regarding the DNA evidence. The defense objected at the beginning of her testimony that the prosecution had not established a proper chain of custody. The prosecution offered to bring in the receiving clerk at the TBI and the officer who brought the evidence to the TBI, but Mr. Springer's counsel objected to any surprise witnesses. The trial court allowed Ms. Staples to testify. Ms. Staples testified that she received DNA samples from the victim and defendants. She also received various items including blood-stained clothing from the garbage bag, blood recovered from a gold Blazer, and a stereo with blood evidence from the crime scene. Ms. Staples testified that many of the items she received did not contain blood evidence, but she was able to identify Mr. Coley's blood DNA on the gray tank top, a black sneaker, the khaki pants, the gold Blazer, and the stereo recovered near the victim's body.

After collecting evidence and interviewing witnesses, the police attempted to locate the defendants. Detective Brown called a number he believed was Mr. Springer's and spoke to a man who responded to the name "Markreo." He did not tell the man there was a warrant for his arrest but asked the man to come in for an interview. The man said he was out of

town, and Detective Brown was not able to make contact with him again. Detective Brown also testified that he had investigated a suspect named James Ronnie Green. Mr. Green was deceased at the time of trial, and the defense moved to admit a recorded interview with Mr. Green in which Mr. Green allegedly made a statement against his interest. In a jury-out offer of proof, Detective Brown testified that Mr. Green was a former employee of Lucky's, that he had stated he was at the Mapco next door to Lucky's on the day of the crime, that he had admitted lying to police regarding his whereabouts, and that he had asserted his right to remain silent. Detective Filter later elaborated that Mr. Green appeared on Mapco's security video, that Mr. Green had gone to Lucky's to borrow a truck in the morning and to return it at around 2:30 p.m., that the victim was seen last alive at around 4:30 p.m., and that Mr. Green's lie to the police had to do with his girlfriend's drug use. Detective Filter also stated that Mr. Green's alibi was confirmed by the police and that Mr. Green was also seen on the Mapco video at 8:30 p.m., stopping by the gas station because his car was overheating. The trial court ruled that Mr. Green's recorded interview was not admissible.

Detective Filter discovered that the defendants were both in Cookeville. The defendants were arrested separately and told they were charged with murder but not told anything regarding the facts of the case. Detective Filter took a DNA sample from both defendants, and these samples were submitted to the TBI. Both defendants asserted their right to remain silent, and Detective Filter placed a tape recorder in the police vehicle. The intelligible portions of the recording consist largely of Mr. Springer energetically recounting his capture. However, at one point, the defendants begin speaking quietly, and one of the defendants can also be heard saying, "You don't tell them anything. . . . You tell them dude said all that racist sh-t. Dude came out with the gun and started shooting." Later, one defendant cautions, "Let's not talk about it."

During trial, the prosecution sought to introduce testimony that Mr. Springer had threatened Ms. Reese while they were both incarcerated. The trial court held a jury-out hearing during which Ms. Reese testified that, while she was in the holding cell, an officer called out her name to come get her lunch. She then heard Mr. Springer calling her a "b-tch," "wh-re," and "snitch." Another inmate, Emily Posey, testified that she was in a holding cell with Ms. Reese and that she heard Mr. Springer's outburst when Ms. Reese's name was called for a special lunch. She later went to get a regular lunch and was first in line. She heard someone say "you stupid, b-tch, I'm going to f-cking kill you."[3] She turned and saw Mr. Springer, who "was like, my bad, I thought that you was the girl that was testifying in my case." The trial court concluded that the testimony was admissible, and both women testified at trial. Mr. Coley made a motion to sever, which was denied. Mr. Springer then called Vincent Feggins and Leonard Johnson, corrections officers who both testified that they

_____

[3]Ms. Posey's testimony varied as to the exact wording of the threat.

heard Mr. Springer curse at Ms. Reese. However, neither heard Mr. Springer threaten Ms. Posey, and both testified that Ms. Posey could not have seen him during the time they were receiving lunches. Both acknowledged they had not written a report and that "it would be a problem" if it were determined they hadn't written up a death threat.

Mr. Coley presented the testimony of Charles Miller, who was living with Mr. Nwaigwe in July 2009 and had spent the afternoon playing basketball with the defendants, Mr. Nwaigwe, and three other men. He testified that he never heard a discussion of committing a robbery and that he did not see the defendants come to Mr. Nwaigwe's house that evening. He acknowledged that there were times when the defendants were talking to Mr. Nwaigwe and he was not part of the conversation. He testified that the defendants had left with Mr. Nwaigwe after the basketball game and that Mr. Nwaigwe dropped them off at the Mapco.

Mr. Coley's counsel then called Detective Filter and introduced through him another prior inconsistent statement made by Mr. Nwaigwe. In this portion of the recording, Mr. Nwaigwe denied having a pistol or giving one to Mr. Springer. On cross-examination, Detective Filter agreed that Mr. Nwaigwe actually stated he did not have a pistol "at that moment."

The jury convicted both defendants of first degree (felony) murder, second degree murder, and especially aggravated robbery. The trial court merged the second degree murder conviction into the first degree murder conviction. The defendants received a life sentence for the felony murder conviction and a concurrent sentence of fifteen years for the especially aggravated robbery conviction. The trial court denied the defendants' motions for a new trial.[4] On appeal, both defendants challenge the sufficiency of the evidence, the admissibility of Mr. Nwaigwe's recorded statements, and the chain of custody of the DNA evidence. Mr. Springer also challenges the admission of the tape recorded conversation between the defendants, the exclusion of the recorded statements of Mr. Green, and the admission of the testimony regarding Mr. Springer's threats. Mr. Coley premises error on the trial court's refusal to grant a severance after the testimony of Mr. Springer's threats was admitted.

---

[4]Due to an oversight, the judgment forms for Mr. Coley were not filed until approximately eight months after the trial, although the judgment forms for Mr. Springer were filed immediately after trial. Accordingly, both motions for a new trial were timely. *See State v. Hatcher*, 310 S.W.3d 788, 799 (Tenn. 2010) (holding that the time for filing a motion for a new trial runs from the time the uniform judgment order is entered).

**ANALYSIS**

**I. Sufficiency of the Evidence**

The defendants argue that both the felony murder and the especially aggravated robbery convictions are not supported by the evidence because the State failed to prove beyond a reasonable doubt that any property was taken from the victim.[5] An appellate court must set aside a finding of guilt if the evidence at trial was insufficient to support that finding beyond a reasonable doubt. Tenn. R. App. P. 13(e). When reviewing the sufficiency of the evidence, the court must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). A guilty verdict rendered by the jury and approved by the trial court accredits the testimony of the State's witnesses and resolves all conflicts of evidence in favor of the prosecution's theory. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The appellant bears the burden of showing that the evidence was insufficient to sustain the verdict, and the presumption of innocence is replaced by a presumption of guilt. *Hall*, 8 S.W.3d at 599. The standard of review is the same for circumstantial and direct evidence, and the prosecution has no duty to rule out every reasonable hypothesis save that of guilt beyond a reasonable doubt. *State v. Dorantes*, 331 S.W.3d 370, 380-81 (Tenn. 2011).

First degree felony murder is a killing committed in the perpetration of or attempt to perpetrate any one of a series of enumerated felonies, including robbery. T.C.A. § 39-13-202(a)(2). Especially aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear when it is accomplished with a deadly weapon and when the victim suffers serious bodily injury. T.C.A. § 39-13-401(a), -403(a). Second degree murder is defined by statute as "a knowing killing of another." T.C.A. § 39-13-210(a)(1).

Seen in the light most favorable to the State, the proof at trial showed that the

---

[5]Mr. Springer's counsel argues that the evidence also does not support a conviction for first degree premeditated murder. The defendants were acquitted of first degree premeditated murder and convicted of the lesser-included offense of second degree murder.

defendants were in need of money for rent and that they planned to rob Lucky's Auto Imports. They discussed their plan to commit a robbery with Mr. Nwaigwe and Mr. Smith. They told Mr. Smith that the intended target was the owner of the shop. Before leaving, Mr. Springer implied he might not see Ms. Reese again. They obtained a gun from Mr. Nwaigwe and asked him to drop them off at a location very near the victim's place of business. When they returned home, witnesses observed a gunshot wound to Mr. Coley's arm, and Mr. Springer was distraught. Mr. Smith saw the defendants remove their clothing and place their clothing in a bag. Mr. Springer then showed Mr. Smith a .25 caliber gun; the victim's son testified that the victim routinely carried a .25 caliber weapon and that this weapon went missing after the homicide. Mr. Springer also told Mr. Smith that the .25 caliber gun belonged to the victim and that Mr. Coley was supposed to "jump" the victim, who shot Mr. Coley. Mr. Nwaigwe came to pick up the defendants, and Mr. Coley's blood was found in his car. Ms. Reese heard Mr. Springer wonder if he killed the victim. Mr. Smith and Mr. Nwaigwe heard Mr. Springer confess to shooting the victim, and Mr. Nwaigwe overheard a discussion between the defendants in which Mr. Springer described shooting three times. The victim was shot twice, and a third bullet was recovered from the wall. Police responded that evening to a 911 call in which Mr. Coley, who claimed to have been the victim of a robbery, requested treatment for a gunshot wound to his arm. Mr. Springer asked Mr. Smith if the police were looking for him, both defendants left town, and Mr. Springer avoided police when he was aware they wanted to interview him. *See Dorantes*, 331 S.W.3d at 388 (noting that an inference of guilt can be drawn from an attempt to evade arrest). The defendants' bloody clothing and a bullet casing, which was the same caliber as the bullets used to shoot the victim, were recovered from the defendants' home. Mr. Coley's blood was recovered from a stereo next to the victim's body. When placed alone in the back of a police vehicle, the defendants expressed no surprise at the crime with which they were being charged and planned to say nothing or that the "dude" had started shooting. Mr. Springer subsequently attempted to threaten Ms. Reese.

The indictment here charged the defendants with a killing committed during the perpetration of or attempt to perpetrate robbery. Both defendants argue that this conviction is not supported by the evidence because the State failed to prove that anything of value was taken. However, there was abundant evidence that the defendants were attempting to commit a robbery, and accordingly, the convictions for felony murder are supported by the evidence.

The defendants also argue that the especially aggravated robbery convictions were not supported by the evidence because the State did not show that property was taken. We conclude that a rational trier of fact could have inferred that property was taken from the fact that the victim's .25 caliber weapon was missing after the homicide and from the fact that Mr. Smith testified the defendants had not only the gun Mr. Nwaigwe had given them but also a .25 caliber weapon when they returned to their home. Mr. Smith also testified that Mr.

Springer stated that this was the victim's gun. While Mr. Coley argues that this evidence should not have been admitted against him, this argument is waived for failure to properly brief it, failure to object contemporaneously, and failure to argue it in the motion for a new trial. *See State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984) (noting that objection was waived and finding no plain error because "the *Bruton* rule should only be applied when the non-testifying co-defendant's statement constitutes 'a significant portion of the evidence of guilt,' and . . . if 'ample evidence was available to demonstrate petitioner's guilt without reliance upon his co-defendant's confession,' the *Bruton* violation would be considered harmless error."). In any case, the statement that the weapon belonged to the victim does not, in itself implicate Mr. Coley in any crime. *See State v. Person*, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989) ("The use of a confession which does not implicate the defendant or from which all references to the moving defendant have been deleted does not fall within the ambit of *Bruton*."). The evidence was sufficient to allow a rational trier of fact to conclude that the defendants intentionally or knowingly committed theft of the .25 caliber gun from the victim by violence, that they used a deadly weapon, and that the victim suffered serious bodily injury. The evidence also supports the jury's conclusion that the defendants committed a knowing killing.

Accordingly, we conclude that the evidence is sufficient to support the verdicts.

## II. Admissibility of Mr. Nwaigwe's Recorded Inconsistent Statements

The defendants next allege that the trial court erred in allowing Mr. Nwaigwe's recorded interview with the police to be entered into evidence. Mr. Coley contends that Mr. Nwaigwe was not given an opportunity to explain or deny the statements and that no jury-out hearing was conducted, as required by the rule. Mr. Springer contends that Mr. Nwaigwe was not subject to cross-examination regarding the testimony.

"The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court." *State v. Rice*, 184 S.W.3d 646, 682 (Tenn. 2006) (appendix). "[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible. Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(26) provides an exception to the hearsay rule for prior inconsistent statements. Such a statement is admissible as substantive evidence if it is otherwise admissible under Tennessee Rule of Evidence 613(b) and:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

 (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

The Advisory Commission's Comment clarifies that the rule is meant "to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example."

Tennessee Rule of Evidence 613(b) states:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

The "only requirement" for admissibility under Rule 613 is that the witness must be given an opportunity to explain or deny the statement. Tenn. R. Evid. 613 Advisory Comm'n Cmt. When a witness "unequivocally admits" to the prior statement, extrinsic evidence may not come in. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). Extrinsic evidence is not admissible until (1) the witness is asked whether the witness made the prior inconsistent statement; and (2) the witness denies or equivocates as to having made the prior inconsistent statement. *Id.* at 565. Extrinsic evidence may come in when a witness does not recall making the prior statement. *State v. Kendricks*, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996). The evidence may be either the written or the recorded content of the statement, or it may be the testimony of another witness. *State v. Reid*, 164 S.W.3d 286, 313-14 (Tenn. 2005). "Rule 613(b) does not expressly limit the impeaching party to one form of extrinsic evidence, nor does it require an impeaching party to choose between two available forms of extrinsic evidence." *Id.* at 314.

Mr. Nwaigwe testified that he did not recall the statement in his recorded interview with police regarding the overheard conversation or the overheard conversation itself. The

-13-

prosecution concluded its questions, and the defense then cross-examined him. Mr. Nwaigwe left the stand. During a break later in the trial, the prosecution alerted the court that it would be seeking to introduce the recording. The trial court ruled that it would address the issue later and that Mr. Nwaigwe should be re-subpoenaed and available as a witness the following day. The next day, the trial court held a jury-out hearing on the admissibility of the tape. The defense objected that the tape should have been played during Mr. Nwaigwe's testimony. Mr. Nwaigwe was available as a witness, but the trial court ruled that the recording could come in through the testimony of Detective Filter. During arguments, the prosecution noted:

> [THE PROSECUTION]: . . .Clearly he made statements for which he has prior inconsistent statements to the police, they were recorded, the Court has to make a finding whether or not the recording of that statement has indicia of trustworthiness, I don't know that there's any argument that it does not.
>
> THE COURT: I agree with you.

The statements here were recorded, and the trial court properly held a jury-out hearing and determined that the statements were made under circumstances indicating trustworthiness. Accordingly, the only dispute is whether introducing the statements after the conclusion of Mr. Nwaigwe's testimony runs afoul the rules and whether Mr. Nwaigwe's opportunity to explain or deny the statements and the defendants' opportunity to cross-examine were adequate.

We conclude that the statements regarding the overheard conversation were properly admitted. Under Rule 613(b), the extrinsic evidence may only come in when "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon." However, evidence under Rule 613 is not limited to recorded or signed statements or statements made under oath; instead, it may also include the testimony of another witness. *State v. Reid*, 164 S.W.3d 286, 313-14 (Tenn. 2005). Clearly, then, Rule 613(b) is designed to include extrinsic evidence which it would be impossible to introduce during the testimony of the witness who made the inconsistent statements. Accordingly, introducing the statement after the conclusion of the witness's testimony does not violate Rule 613. Rule 803(26) merely requires that "[t]he declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement." Mr. Nwaigwe was asked on direct examination regarding the conversation he overheard between the defendants in which Mr. Springer admitted to shooting three times, and he denied overhearing the conversation. When reminded of his prior inconsistent statement to the police, he continued to assert a lack of memory regarding making the statement and

-14-

regarding the conversation he overheard. The defense attorneys, who were aware of the contents of the recording, were given the opportunity to cross-examine him. The recorded statement was subsequently properly authenticated by Detective Filter and introduced during his testimony. We note that Mr. Nwaigwe remained under subpoena and could have been called as a witness by the defense. We conclude there is nothing in the plain language of Rule 803(26) to require the statement to be played while the witness is on the stand.

Mr. Nwaigwe was also asked on direct examination if the defendants had asked for his weapon or if Mr. Springer had discussed wanting a weapon, and Mr. Nwaigwe denied it, testifying instead that he "just gave it to him." However, Mr. Nwaigwe was never confronted with the fact that this was not consistent with his prior statement to police in which he had said that Mr. Springer called him to ask for the weapon. This portion of the recorded statement was nevertheless also played for the jury. Because he was not given the opportunity to explain or deny the prior inconsistent statement, this was in error. The admission of evidence in error does not require a reversal if the error was more probably than not harmless. *Rice*, 184 S.W.3d at 683 (appendix). Here, the proof of the defendants' guilt was otherwise overwhelming. Furthermore, Mr. Smith testified that he overheard Mr. Springer call Mr. Nwaigwe and ask for the gun. Mr. Nwaigwe's recorded testimony that the defendants procured Mr. Nwaigwe's gun by request rather than as an unsolicited gift is cumulative of other proof at trial and most probative of the element of premeditation in the premeditated murder charge of which the defendants were acquitted. We conclude that any error was harmless.

### III. Chain of Custody

The defendants assert that the DNA evidence which established Mr. Coley's presence at the scene of the crime should not have been entered into evidence because the chain of custody was not established. The State counters that the defendants have waived this issue by failing to object when the evidence itself was introduced.

Questions regarding whether the State has properly established a chain of custody are reviewed for an abuse of discretion standard. *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008).

"As required by Rule of Evidence 901(a), it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Scott*, 33 S.W.3d at 760 (quoting

*State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998)). The chain of custody serves to show that there has been no tampering, loss, substitution, or mistake regarding the evidence. *Scott*, 33 S.W.3d at 760. The identity of tangible evidence need not be proven beyond all possibility of doubt, and the State is not required to exclude every possibility of tampering. *Cannon*, 254 S.W.3d at 296. "An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item." *Id.* Instead, the circumstances must reasonably establish the identity and integrity of the evidence. *Scott*, 33 S.W.3d at 760; *Davis v. Shelby Cnty Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009).

Officer Kirby testified that he swabbed bloodstains around the victim and that he collected into evidence the stereo on which Mr. Coley's blood was eventually found. He testified he submitted all the items he collected into the unit's property and evidence section. He testified that although evidence was not collected until the day following the homicide, the premises were locked when the police left the scene overnight. Officer Kirby identified the stereo, which was admitted into evidence. Detective Filter testified that he was present when the defendants' bloody clothing was recovered from the plastic garbage bag at the boarding house. Officer Brown was also present when Officer Mace collected the items in the garbage bag. Officer Filter testified that he took the DNA samples from the defendants for testing and that he personally delivered the stereo faceplate with blood to the TBI.

During the testimony of Laura Staples, the defendant objected to the chain of custody. The prosecution acknowledged that the clerks of the Metropolitan Nashville Police Department and the TBI had not been called, and the prosecutors offered to call these witnesses to complete the chain of custody. Mr. Springer's counsel objected to the presentation of any additional witnesses. The trial court allowed Ms. Staples to testify, concluding that the chain of custody was adequately established. Ms. Staples testified that evidence was always brought by law enforcement to the TBI and that it was kept in a secure area. She testified that the paperwork indicated the evidence had been brought by Detective Filter and that Jennifer Gillis of the TBI had received it. Ms. Staples identified sixteen pieces of evidence brought on one date by Detective Filter, including DNA samples from a vehicle, the clothing from the garbage bags, and the stereo. She testified she also received DNA profiles from the victim and the two defendants. Ms. Staples found Mr. Coley's blood on certain pieces of clothing from the garbage bag, on samples taken from the vehicle, and on the stereo from the crime scene. She acknowledged that she could not testify that the integrity of the evidence had been maintained prior to being submitted to the TBI.

The defendants argue that the prosecution did not establish the integrity of the evidence from the time it was collected until the time Ms. Staples analyzed it. The State relies on *State v. Barrett* for the proposition that the objection is waived for failure to timely

raise it because the defense did not object when the stereo was introduced into evidence. *State v. Barrett*, M2010-00444-CCA-R3CD, 2012 WL 2914119, at *23 (Tenn. Crim. App. July 18, 2012). However, in *Barrett*, the objection came when the lab analyst testified regarding the evidence, and while the court found the objection waived as to the items themselves, it concluded that the objection was timely as to the introduction of the laboratory analysis. *Id.* In this case, the stereo was made an exhibit through Officer Kirby and was presented to Ms. Staples, but the defendants objected prior to the introduction of the laboratory analysis which tied Mr. Coley to the stereo. The objection to the DNA analysis evidence challenged on appeal was timely.[6]

However, we nevertheless conclude that Mr. Springer has waived the argument. When Mr. Springer's counsel first objected to the evidence, the prosecution offered to bring in additional witnesses. Mr. Coley's counsel asserted that the receiving clerk was routinely called in drug cases. Mr. Springer's counsel, however, objected to the introduction of any additional witnesses. The trial court ruled that the State could present Ms. Staples's testimony without calling further witnesses. Tennessee Rule of Appellate Procedure 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Because Mr. Springer objected to the State's attempt to cure any defect in the chain of custody, we conclude he has waived the argument.

Mr. Coley contends that under *State v. Scott*, the evidence tying Mr. Coley's blood DNA to the crime scene should have been excluded. In *Scott*, hairs suspected to belong to the perpetrator were submitted to the FBI prior to being submitted to the TBI. *Scott*, 33 S.W.3d at 760. When the hairs were returned from the FBI, they were mounted on slides, and the prosecution did not introduce any evidence regarding how they came to be mounted on slides. *Id*. at 761. The Tennessee Supreme Court found that this missing link was crucial to the chain of custody. *Id.*

However, numerous cases have concluded that the chain of custody was adequately established despite the absence of testimony from some custodians who had possession of the evidence. *Davis*, 278 S.W.3d at 267-68 (concluding chain of custody was adequately established although collector of specimen did not testify); *State v. Goad*, 692 S.W.2d 32, 36 (Tenn. Crim. App. 1985) (concluding the chain of custody was established when the custodian of the property room did not testify but other officers did); *State v. Laning*, No.

---

[6]Moreover, this court has previously interpreted an objection to chain of custody made after all the State's witnesses had testified as a timely motion to strike. *State v. Dean*, 76 S.W.3d 352, 368 (Tenn. Crim. App. 2001).

E2011-01882-CCA-R3-CD, 2012 WL 3158782, at *3 (Tenn. Crim. App. Aug. 6, 2012) (chain of custody established although neither police evidence custodian nor TBI receiving clerk testified).

In particular, this court has considered whether or not there was any indication that the integrity of the evidence had been compromised while the evidence rested in the control of a custodian not called to testify. *Barrett*, 2012 WL 2914119, at *25 ("There was no proof to suggest that tampering or incorrect handling occurred."); *Dean*, 76 S.W.3d at 370 ("Although the defendant stressed at trial and on appeal possibilities of tampering and contamination, there was no showing that this occurred."); *State v. Arbuckle*, No. M2000-02885-CCA-R3-CD, 2001 WL 1545494, at *3 (Tenn. Crim. App. Dec. 5, 2001) ("There is no evidence of tampering, loss, substitution, mistake, or any other irregularities concerning the Defendant's blood sample."); *compare Cannon*, 254 S.W.3d at 298 (concluding that the chain of custody was not established when photographic evidence and contemporaneous reports did not indicate victim was wearing pantyhose and no witness could testify to collecting the pantyhose from the victim); *Scott*, 33 S.W.3d at 761 (concluding chain of custody was not established when evidence had been visibly changed by mounting on slides).

In this case, the crucial piece of DNA evidence tying the defendants to the crime was the stereo, spattered with Mr. Coley's blood, recovered from the site of the murder. Officer Kirby testified he collected and sealed this evidence, Detective Filter testified he took it to the TBI, and Ms. Staples testified that the TBI's receiving clerk obtained it from Detective Filter and that she took it from the clerk and analyzed it. The other pieces of blood DNA evidence were also obtained from Detective Filter on that same date. There is no indication that any tampering occurred. We conclude that the State established with reasonable assurance the identity and integrity of the evidence challenged by Mr. Coley. Accordingly, this issue is without merit.

### IV. Tape Recording of the Defendants' Conversation

Defendant Springer contends that the introduction of his tape-recorded conversation with Defendant Coley violates his due process rights and his Fifth Amendment rights.[7] He argues that the police could not constitutionally record his conversations after he had invoked his right to remain silent.

A trial court's findings of fact at a suppression hearing are binding on the reviewing

---

[7] Mr. Springer does not claim that his Fourth Amendment rights were violated, and we note that there is no objectively reasonable expectation of privacy in the back of a police vehicle. *State v. Morgan*, 929 S.W.2d 380, 384 (Tenn. Crim .App. 1996).

court unless the evidence preponderates against them. *State v. Talley*, 307 S.W.3d 723, 728 (Tenn. 2010). Questions of law and a trial court's application of law to the facts are reviewed de novo. *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect the accused from compelled self-incrimination. When an accused invokes the right to remain silent, the police must generally refrain from further interrogation. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).

In the case at bar, however, the defendants were not being interrogated when they sat in the backseat of the police car. This case is indistinguishable from *State v. Gosnell*, 62 S.W.3d 740 (Tenn. Crim. App. 2001). In *Gosnell*, the married defendants were put in the back of a police car while their home was searched. *Id.* at 743. One of the defendants exited the car to use the restroom and was Mirandized while outside the vehicle. *Id.* at 748. She asserted her right against self-incrimination and requested a lawyer. *Id.* She then returned to the car, where she and her husband discussed the crime. *Id.* On appeal, she asserted that her Fifth Amendment right to remain silent was violated. This court concluded that because she was not being interrogated, there was no violation. *Id.*; *see also Smith v. State*, E2010-00488-CCA-R3-PC, 2012 WL 260022, at *3 (Tenn. Crim. App. Jan. 30, 2012) (concluding there was no *Miranda* violation when conversation between defendants was recorded in the back of a police car). This court also held that "the subterfuge employed by the authorities to secretly record her unsolicited remarks does not violate the constitutional rights of the defendant." *Gosnell*, 62 S.W.3d at 748. We conclude that neither the defendant's Fifth Amendment right against self-incrimination nor his due process rights were violated.

### V. Exclusion of Mr. Green's Recorded Statements

Mr. Springer also contends that the trial court erred in excluding the prior recorded testimony of Mr. Green because he was unavailable and had made statements against his interest under Tennessee Rule of Evidence 804. The State counters that this argument is waived.

Mr. Springer's brief asserts that Mr. Green made statements against his interest but does not specify what those statements are. The record reveals that Detective Filter and Detective Brown testified that Mr. Green had been at the Mapco next door to the victim's business on the day of the homicide and that in a recorded interview, he had admitted that he had lied about his whereabouts to police. Detective Filter elaborated that the lie told by

Mr. Green about his whereabouts had to do with his girlfriend's drug use.[8] Detective Filter testified that Mr. Green's alibi was confirmed and that he was no longer a suspect in the homicide at the time of his death. The video of Mr. Green's statement was made an exhibit to the offer of proof, but it is not in the record on appeal.

We agree with the State that the defendant has not properly briefed or preserved this argument on appeal. Under Tennessee Court of Criminal Appeals Rule 10(b), this court treats as waived any issues not supported by argument, citation to authorities, or appropriate references to the record. Further, it is the duty of the appellant to prepare a transcript "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b).

In any event, the trial court's decision to exclude the statement was not made under the hearsay exception described in Rule 804, as Mr. Springer contends. Instead, after learning that Mr. Green's statement against interest was an admission that he had lied to the police in connection with his girlfriend's drug use, the trial court excluded the statement under the test of relevance. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A trial court's determinations to exclude evidence based on relevance are reviewed for abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003). The only portion of Mr. Green's recorded interview that Mr. Springer alleges is admissible is the statement against his interest. Even if the issue were preserved, we would conclude that the trial court properly excluded the statement on the basis of relevance.

### VI. Testimony Regarding Mr. Springer's Threats

Mr. Springer argues that the testimony of Ms. Reese and Ms. Posey should have been excluded under Tennessee Rule of Evidence 404(b) because the actual threat was made to Ms. Posey and not Ms. Reese and because the unfair prejudice outweighed any probative value. A decision to admit or exclude evidence lies largely within the discretion of the trial court and will not be disturbed on appeal absent abuse of that discretion. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). When the evidence in question is evidence of other crimes, wrongs, or acts under Tennessee Rule of Evidence 404(b), the trial court's decision is reviewed for an abuse of discretion if the procedural mandates of the Rule were followed. *Id.*

---

[8]One of the prosecutors had previously clarified that Mr. Green had taken his girlfriend, who was in rehab, to purchase crack cocaine but that he did not want police to know she was using drugs so he lied about where he had taken her.

Under Tennessee Rule of Evidence 404(b), evidence of other crimes, wrongs or acts is not admissible as character evidence, but it may be admissible for other purposes. Before such evidence can be admitted,

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). When evidence of other wrongs is admitted, "trial courts should, when asked to do so, 'restrict the evidence to its proper scope and instruct the jury accordingly.'" *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013) (citing Tenn. R. Evid. 105).

"Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." *State v. Maddox*, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (quoting *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978)). "Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt." *State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002) (appendix). In *Maddox*, the defendant had sent letters to a witness, and the letters included veiled threats designed to prevent the witness from talking to law enforcement. *Maddox*, 957 S.W.2d at 552. The court concluded the threats were relevant and admissible. *Id.*; *see also State v. Ford*, W2000-01205-CCA-R3CD, 2002 WL 1592746, at *10 (Tenn. Crim. App. July 12, 2002) (concluding threatening letters were properly admitted under Rule 404(b)); *State v. Moore*, 01C01-9801-CR-00032, 1999 WL 226227, at *9 (Tenn. Crim. App. Apr. 20, 1999) (admitting threatening letters).

Here, the trial court properly conducted a jury-out hearing during which Ms. Reese and Ms. Posey testified regarding Mr. Springer's remarks. After hearing the State's argument that the threats were relevant to an inference of guilt under *Maddox*, the trial court

found that the testimony had shown by clear and convincing evidence that Mr. Springer had made the statements and that the unfair prejudice did not outweigh the probative value. Accordingly, the procedural mandates of the statute were satisfied, and we review for abuse of discretion.

Mr. Springer argues that *Maddox* does not apply. He contends that he made no threat towards a witness because the threatening words were not directed at Ms. Reese; however, the evidence suggests that Mr. Springer mistook Ms. Posey for Ms. Reese. It is not necessary for the threat to be made directly to the witness threatened. *See Ford*, 2002 WL 1592746, at *10 (admitting letters instructing a third person to threaten witnesses). Under *Maddox*, the evidence of Mr. Springer's threat is admissible. *Maddox*, 957 S.W.2d at 552. The statements made directly to Ms. Reese were introduced not as character evidence but as evidence of Mr. Springer's motive and intent in making a threat to Ms. Posey. We conclude that the trial court did not abuse its discretion in concluding that the danger of unfair prejudice did not outweigh the probative value of the testimony.

## VII. Severance

Mr. Coley also argues that the trial should have been severed when the prosecution was permitted to introduce evidence that Mr. Springer attempted to threaten Ms. Reese. Mr. Coley argues that the introduction of the statements violated his right to confrontation of witnesses, that no limiting instructions were given, and that the prosecution argued that the guilt of both defendants should be inferred from the statement.

Tennessee Rule of Criminal Procedure 14 governs severance. The Rule provides that the trial court shall grant a severance of defendants, if "during trial, with consent of the defendants to be severed, the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(B).

A trial court's decisions regarding joinder and severance are reviewed for an abuse of discretion. *State v. Dellinger*, 79 S.W.3d 458, 467-68 (Tenn. 2002). The trial court's decision will only be reversed when the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Schiefelbein*, 230 S.W.3d 88, 125 (Tenn. Crim. App. 2007) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). The State is entitled to try two or more persons charged jointly with a single crime in one trial unless a single trial would unfairly prejudice the rights of the defendants. *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000). "Disparity in the evidence against the defendants is not alone sufficient to

warrant the grant of a severance." *Id.* "This means that the mere fact that damaging proof against one defendant is presented will not, by itself, entitle another defendant to a severance." *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993). When a defendant asserts error in the denial of a motion for severance, the test is whether the defendant was clearly prejudiced as a result of being tried with the co-defendant. *State v. Mickens*, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003).

Mr. Coley asserts error in the fact that the trial court did not give limiting instructions at the time that the evidence of Mr. Springer's threats were introduced. While limiting instructions were discussed during the jury-out hearing, Mr. Coley did not petition the trial court for contemporaneous instructions at the time that the evidence was introduced in front of the jury. Accordingly, the State is correct that this issue is waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Furthermore, the trial court gave limiting instructions at the close of trial.[9] The prosecutor referred to the evidence of the threats but did not argue that the evidence should apply to both defendants. After arguing that both defendants were guilty of the crimes charged, the prosecutor stated:

> And if you were not guilty of those things, why would you threaten to kill a witness if you were not guilty, if you did not want to put fear in the heart of Ms. Ree[s]e, who didn't even really see you commit the robbery, why would you threaten to kill her? Only one reason, ladies and gentlemen, because you are guilty, and I ask you to find them guilty.

In *State v. Maddox*, the two defendants had committed a robbery of a business. Defendant Maddox wrote a witness letters containing veiled threats against a witness should she communicate with the police. *State v. Maddox*, 957 S.W.2d 547, 551-52 (Tenn. Crim. App. 1997). The letters, which contained no reference to the co-defendant, were admitted at trial. *Id.* The co-defendant argued on appeal that he should have been granted a severance. *Id.* at 556. This court concluded that because the threats made no reference to the co-defendant, there was no violation of *Bruton v. United States*, 391 U.S. 123 (1968). *Maddox*, 957 S.W.2d at 556; *see also State v. Gosnell*, 62 S.W.3d 740, 749 (Tenn. Crim. App. 2001) (concluding there was no *Bruton* violation because co-defendant's jailhouse

---

[9]The trial court instructed the jury, "You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant, except on the issue of criminal responsibility for the conduct of another."

statement asserting that he told his brother to destroy the murder weapon did not inculpate defendant).  Furthermore, the *Maddox* court concluded that there was no prejudice because the co-defendant was the only person who had been positively identified by a witness at the scene.  *Id.*

We conclude that this case is not distinguishable from *Maddox*.  Here, Mr. Springer's threats against the witness contained no reference to Mr. Coley, thus there was no violation of the Confrontation Clause.  Furthermore, even if the statement had been admitted in error, Mr. Coley, like the co-defendant in *Maddox*, would not be able to show prejudice, as DNA evidence tied him to the crime.  Accordingly, we conclude Mr. Coley is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE